JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

JEEPSTER RECORDINGS LTD.,

        Plaintiff,

- vs -

WORLD'S FAIR LABEL GROUP INC.

        Defendant

---------------------------------------------------------x

Case No. 09 CV 2155

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

RECEIVED MAR 09 2009 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff Jeepster Recordings Ltd. ("Jeepster"), by and through its undersigned attorneys Davis Wright Tremaine LLP, as and for its complaint against defendant World's Fair Label Group, Inc. ("World's Fair"), alleges as follows:

## NATURE OF THIS ACTION

1. In this action, Jeepster seeks to recover monies improperly retained by its former distribution agent, World's Fair, in breach of an agreement between these two parties (the "Distribution Agreement"), in addition to substantial damages Jeepster has sustained by reason of the failure of World's Fair to adequately promote and/or properly administer two albums of one of Jeepster's best known artists, *Snow Patrol*, in North America, and damages caused by World's Fair's conduct after Jeepster terminated the Distribution Agreement.

2. Jeepster is a well-known independent record label, based in England, which owns and controls certain sound recordings of several critically acclaimed musical groups including *Belle & Sebastian* and *Snow Patrol*. Pursuant to the Distribution Agreement, from 2006-2008, World's Fair agreed to, *inter alia*, manufacture and distribute two Snow Patrol Albums (their critically acclaimed debut album, as well as a follow-up album) in North America (the "Snow Patrol Albums"), to regularly account and remit payments by third-party retailers for these

albums; and to promote and solicit third-party licensing of tracks on the Snow Patrol Albums. As further explained hereafter, the parties also agreed that World's Fair would be responsible for administering and paying any mechanicals royalties due to the Harry Fox Agency ("HFA").

3. World's Fair, in clear breach of its contractual obligations, failed to fulfill those obligations, including but not limited to failure to timely or fully account and remit all monies due to Jeepster for the past two years, and failure to adequately promote the Snow Patrol Albums.

4. Upon termination of the Distribution Agreement, while acknowledging its substantial debt to Jeepster, World's Fair failed and refused to make the remaining royalty payments due and owing to Jeepster, to release the sizeable reserve funds it insisted on holding, and to furnish proof that all outstanding payments due to third parties including HFA in connection with the Snow Patrol Albums had been paid. Further, Jeepster was unable to transition to another distributor in time to have the Snow Patrol Albums in the North American market when *Snow Patrol's* fifth album was released in October 2008, which caused Jeepster to lose a substantial and unique sales opportunity.

## PARTIES

5. Jeepster Recordings Ltd. is a United Kingdom limited liability company with its principal place of business in Winchester, Hampshire, England S022 5HP.

6. Upon information and belief, World's Fair Label is a New York corporation with its principal place of business at 147 West 24th Street, 5th Floor, New York, NY 10011.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as an action between citizens of this country and a foreign country and the amount in controversy exceeds $75,000.00.

DWT 12435076v4 0088637-000001

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) as, upon information and belief, World's Fair may be found in this District and/or has it principal place of business here.

9. The Distribution Agreement, a copy of which is annexed hereto as Exhibit A and incorporated herein by reference, expressly provides that any dispute relating to this Agreement shall be brought in Federal or State Court in the City and State of New York, and shall be interpreted in accordance with New York law. (Ex. A, ¶ 10)

## FACTS

### *Two Snow Patrol Albums*

10. World's Fair provides distribution and administrative services to independent record labels and artists with self-releases. It advertises and promotes itself as being available and capable of providing distribution, marketing, sales, accounting, and financial services for labels and artists.

11. Jeepster is an independent record label based in the United Kingdom which owns various master sound recordings of critically acclaimed artists, including *Snow Patrol*. It is an Irish rock band that has achieved, over the years, tremendous mainstream success. Jeepster controls the rights to the group's debut album "*Songs for Polarbears*" initially released in 1998, and their follow up album "*When It's All Over We Still Have To Clear Up*" released in 2001.

12. *Snow Patrol*'s popularity has grown exponentially since their first two albums were released. The band's 2003 album, *Final Straw* (released in North America on Interscope Records) was hugely successful, and achieved four-time platinum sales. *Snow Patrol*'s 2006 album, *Eyes Open*, sold approximately 4.7 million copies. In total, *Snow Patrol* has sold over 7 million albums worldwide, has headlined or participated in world tours with successful recording

artists such as U2, and has earned substantial amounts from the licensing of their music to third parties.

13. On or about May 30, 2006, timed to immediately follow the May 1, 2006 release of the new *Eyes Open* album on Interscope Records, Jeepster reissued *Snow Patrol's* debut and follow-up albums with additional content: the debut album contained nine additional tracks, and the second album contained four extra tracks and the rarely seen promotional video for the single "*Ask Me How I Am*". The timing of the re-release of the Snow Patrol Albums was uniquely positioned to capture and trade upon the increased popular interest and marketing efforts surrounding around the much anticipated *Eyes Open* album.

14. On October 28, 2008, *Snow Patrol* released its fifth album titled "*A Hundred Millions Suns*" on Interscope Records. As with the release of its prior two albums, there was tremendous anticipation and marketing efforts surrounding this release, and press coverage for the band, and Jeepster expected increased sales of the Snow Patrol Albums in North America as a result of this renewed interest in the band. But as a result of World's Fair's several breaches of contract, and its continuing to hold itself out as the distributor of the Snow Patrol Albums after termination of the Distribution Agreement, Jeepster was unable to transition to a new North American distributor for its Snow Patrol Albums during this lucrative time period.

### *Obligations of the Parties under the Distribution Agreement*

15. On or about January 1, 2006, in advance of the upcoming re-release of the Snow Patrol Albums, the parties entered into the Distribution Agreement.

16. Schedule A to the Distribution Agreement identifies the six albums in the Jeepster catalogue that were the subject of this agreement. The parties agreed that World's Fair would initially distribute the two Snow Patrol Albums. Given World's Fair's failures to perform from

the outset, neither party ever sought to expand World's Fair distribution responsibilities to include any of the other albums identified in Schedule A.

17. Pursuant to the Distribution Agreement, Jeepster provided World's Fair with masters of the Snow Patrol Albums, and associated artwork and other related materials. In exchange for a distribution fee, World's Fair agreed to provide "comprehensive distribution and label administration" services to Jeepster, throughout North America for a two-year term commencing January 1, 2006.

18. The Distribution Agreement sets forth World's Fair's obligations as follows:

   (a) To sell and distribute Snow Patrol Albums to third-party retailers in all formats throughout North America and to administer and service those sale contracts;

   (b) To fully, accurately, and timely account and pay all outstanding monies due to Jeepster within sixty days of World's Fair's receipt of such monies from retailers after deducting its twenty-percent (20%) distribution fee;

   (c) To market and promote the Snow Patrol Albums through the World's Fair-owned marketing company, Hellfire;

   (d) To solicit synchronization and other third-party licensing opportunities for the Snow Patrol Albums; and

   (e) To manufacture and control the inventory of the Snow Patrol Albums ("Inventory") for distribution in North America, although title and ownership of the Inventory remains solely with Jeepster.

19. Although not expressly provided for in the Distribution Agreement, the parties later agreed that, consistent with industry custom and practice, World's Fair could withhold an amount of "reserve" funds to pay for any returns of the merchandise ("Return Reserve") and an amount to cover any outstanding manufacturing costs or invoices ("Manufacturing Reserve").

20. As part of its distribution function, World's Fair offered and agreed to register the Snow Patrol Albums with HFA, which is a mechanical licensing, collection, and distribution agency for music publishers and to administer and pay any royalties owed to HFA. World's Fair

withheld a portion of funds in "reserve" for the payment of mechanical royalties ("Mechanical Reserves").

## *Breaches of the Distribution Agreement by World's Fair*

21. Since the inception of their relationship, World's Fair has failed to satisfy its contractual obligations to Jeepster in numerous ways. Consequently, on or about September 11, 2008, Jeepster notified World's Fair that its consistent failure to properly account and pay all monies due under the Distribution Agreement constituted a material breach and that failure to cure would result in termination.

22. World's Fair failed to cure the material breach and the Distribution Agreement therefore terminated on or about September 26, 2008.

23. World's Fair's various breaches include, *inter alia*, the following:

(a) *Failure to Account and Pay Royalties Due and Owing.* World's Fair failed to account and remit royalties due and owing under the Distribution Agreement. For the period of January 1, 2006 through to August 31, 2007, World's Fair has paid royalties due for this period, but upon information and belief, additional amounts may be due for this period. For the period of September 1, 2007 to November 30, 2007, World's Fair has made some royalty payments but concedes that an additional $10,000 is due. Jeepster has reason to believe that additional amounts may also be due for this time period. Finally, for the time period December 1, 2007 to November 30, 2008, World's Fair has made no royalty payments. Based upon the fragmented information Jeepster has received, upon information and belief, World's Fair owes it an amount substantially in excess of fifty-thousand dollars ($50,000) for outstanding royalties.

(b) *Wrongful Withholding of Return Reserves and Untimely Acceptance of Returns.* Upon information and belief, World's Fair has wrongfully refused to return to Jeepster an amount in excess of five thousand dollars ($5,000), purportedly withheld by World's Fair as an

6

alleged "reserve" to reimburse retailers for returned products. World's Fair should have notified all third-party retailers on or about September 26, 2008 that the Snow Patrol Albums had been deleted from its catalogue and any inventory must be returned in accordance with industry custom and practice. It did not do so. When Jeepster learned that World's Fair failed to notify retailers, Jeepster explicitly instructed World's Fair not to accept any returns after December 31, 2008. Nonetheless, World's Fair continues to withhold the Return Reserve in material breach of its contractual obligations and duty of good faith and fair dealing.

(c) *Wrongful Withholding of Manufacturing Reserves.* Upon information and belief, World's Fair has wrongfully refused to return to Jeepster an amount in excess of thirty-three thousand two-hundred sixty dollars ($33,260) withheld by World's Fair for products that were manufactured before September 2007 and should have been paid already. Accordingly, its refusal to remit the Manufacturing Reserve despite due demand therefor is a further and material breach of its contractual obligations and duty of good faith and fair dealing.

(d) *Wrongful Withholding of Mechanical Reserves.* World's Fair agreed to register the Snow Patrol Albums with HFA and to submit to HFA a statement of album sales along with a payment for mechanical royalties, in accordance with industry custom and practice. Despite numerous requests, World's Fair has failed and refused to provide any proof that it has made complete and timely payments to HFA for the Snow Patrol Albums. Upon information and belief, World's Fair still holds the entire amount earmarked for Mechanical Reserves in an amount believed to be in excess of sixty-thousand dollars ($60,000). In or around November 2007, Jeepster demanded that World's Fair return the Mechanical Reserves and/or furnish proof of payments made to HFA in connection with the Snow Patrol Albums. World's Fair's continuing refusal to remit the Mechanical Reserve and/or to furnish proof of payment to HFA is

7

a further and material breach of its contractual obligations and duty of good faith and fair dealing.

24. Without the benefit of a full and complete accounting, Jeepster is unsure of the total amount of money that World's Fair owes to it, but, upon information and belief, World's Fair has wrongfully retained an amount in excess of one hundred fifty thousand dollars ($150,000.00).

25. Jeepster has also been damaged in a substantial but presently undetermined amount as a result of World's Fair usurpation and waste of unique and valuable assets, namely the North American distribution rights of the Snow Patrol Albums.

26. Jeepster has been and continues to be harmed by reason of its inability to promptly retain a new North American distributor for the Snow Patrol Albums in light of World's Fair obstructive and bad faith conduct since notice of termination of the Distribution Agreement, which includes but is not limited to Jeepster's inability to locate a new distributor when the fifth *Snow Patrol* album was released in October 28, 2008.

27. World's Fair has admitted that the Distribution Agreement has terminated, and that it is no longer authorized to hold itself out as Jeepster's agent in North America. Likewise, it has admitted its obligation to pay mechanical royalties to HFA, but it has failed to provide any proof of payment. It has also acknowledged that it owes Jeepster substantial amounts of unpaid royalties and has promised prompt payment, but nevertheless, it has failed and refused to pay Jeepster the monies it admittedly owes.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Breach of Contract)

28. Jeepster repeats and realleges the allegations of paragraphs 1 through and including 27 set forth hereinabove, as if the same were fully set forth herein.

29. The Distribution Agreement is a valid and enforceable contract between the Jeepster and World's Fair.

30. As above detailed, World's Fair has breached the Distribution Agreement in numerous material respects.

31. Jeepster has fully performed its obligations under the Distribution Agreement, and all conditions precedents have occurred or have been performed, waived or otherwise satisfied.

32. As a direct and proximate result of World's Fair's material breaches, Jeepster has suffered and will continue to suffer damages in an amount presently unknown but believed to be in excess of one hundred fifty thousand dollars ($150,000.00).

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Implied Contractual Duty of Good Faith and Fair Dealing)

33. Jeepster repeats and realleges the allegations of paragraphs 1 through and including 27 set forth hereinabove, as if the same were fully set forth herein.

34. World's Fair was subject to a duty of good faith and fair dealing under the Distribution Agreement.

35. Jeepster depended on World's Fair to act as its distribution agent, and to fully and timely account and remit proceeds and credits from all third-party sales and licensing transactions under the Distribution Agreement which were entrusted to World's Fair.

36. World's Fair breached its duty of good faith and fair dealing by taking actions to frustrate, injure, or to interfere with the right of Jeepster to receive the benefit or consideration provided for by the Distribution Agreement.

37. Jeepster has suffered significant financial loss of an undetermined amount due to World's Fair breach of its duty of good faith and fair dealing.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Accounting)

38. Jeepster repeats and realleges the allegations of paragraphs 1 through and including 27 set forth hereinabove, as if the same were fully set forth herein.

39. World's Fair acted as Jeepster's exclusive distributor of the Snow Patrol Albums in North America, and was entrusted with receiving and remitting to Jeepster all proceeds earned from the sale, licensing, distribution and other exploitation of the Snow Patrol Albums. World's Fair has exclusive access to accounting information showing all income earned from this activity.

40. World's Fair had the duty to account to Jeepster for its share of all income generated by the Snow Patrol Albums, but has breached this duty by failing to fully and completely account to Jeepster for all derived income.

41. Without accounting information from World's Fair, Jeepster is unable to fully assess or calculate the amount of monies due and owing to Jeepster in connection with such exploitation by World's Fair.

42. Jeepster has no adequate remedy at law.

43. As a direct and proximate result, Jeepster has suffered and will continue to suffer damages in an amount presently unknown but believed to be in excess of one hundred fifty thousand dollars ($150,000.00).

WHEREFORE, Jeepster demands judgment as follows:

(a) For compensatory and consequential damages as the result of World's Fair's various breaches of the Distribution Agreement in an amount to be determined at trial, together with pre-judgment interest thereon as provided by law;

(b)     For an accounting of all monies, gains, expenses, profits and consideration in any form that World's Fair has derived from its distribution, sale and exploitation of the Snow Patrol Albums, and upon such accounting, for an award of the monies shown to be due and owing to Jeepster.

(c)     For such other and further relief and remedies available which the Court may deem just and proper, including attorney's fees and costs.

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on each claim for relief alleged in the Complaint.

Dated:     New York, New York
           March 9, 2009

                                    DAVIS WRIGHT TREMAINE LLP

                              By:   /s/ Marcia B. Paul
                                    Marcia B. Paul (MP 8427)
                                    Monica Pa (MP 3307)
                                    1633 Broadway
                                    New York, New York 10019
                                    (212) 489-8230 (phone)
                                    (212) 489-8340 (facsimile)

                                    *Attorneys for Plaintiff
                                    Jeepster Recordings Ltd.*

# EXHIBIT A

World's Fair Label Group, Inc.
c/o William A. Berrol, Esq.
2815 Townsgate Rd. #340
Westlake Village, CA 91361
U.S.A.

As of January 1, 2006

Jeepster Recordings Ltd
PO Box 107
Winchester, Hampshire
England
S022 5ZH

RE: <u>World's Fair-w-Jeepster</u>

Gentlemen:

The following memorandum of agreement sets forth the material terms and conditions pursuant to which World's Fair Label Group, Inc. ("WF") shall render its distribution and label administration services to Jeepster Recordings Ltd ("Jeepster"). Accordingly, the parties hereto hereby agree as follows:

1. <u>Purpose</u>-WF is engaged to provide its services in connection with the comprehensive distribution and label administration of Jeepster, as more specifically set forth herein, by providing label management in conjunction with Jeepster executives with respect to its manufacturing, distribution, sales, marketing and promotion of records to be released by Jeepster in the Territory during the Term.

2. <u>Term</u>-The term hereof shall commence as of the date hereof and continue for a period of Twenty Four (24) months thereafter ("Term"). Notwithstanding the foregoing, in the event that either party hereto shall not terminate the foregoing Term hereof, in writing, not less than Ninety (90) days prior to the expiration of the Term, the Term hereof shall automatically be extended for additional One (1) year periods until the appropriate notice of termination is tendered by a party hereto.

3. <u>Territory</u>-North America, which includes the U.S., Canada and Mexico.

4. <u>Releases Per Year</u>-In connection with WF's services hereunder, WF shall be required to render its services in connection with a mutually agreed upon number of releases of preexisting Jeepster catalog per year. In the event that Jeepster requests WF's services in connection with additional catalog or new releases, the parties shall mutually determine the terms and conditions applicable thereto.

5. **WF Obligations**-During the Term hereof for the Territory, WF shall provide Jeepster with: (a) Exclusive distribution of records in all formats, including digital, in the Territory via various appropriate distribution channels and distributors, on an exclusive or non-exclusive basis with such distributor(s) upon terms which shall be negotiated by WF in consultation with Jeepster (b) Retail sales via the WF sales department and WF-owned marketing company, Hellfire, including but not limited to active solicitation of all retail stores, maintenance of back catalog and awareness programs with respect to Jeepster artists and titles (c) Solicitation of synchronization and other third party licensing opportunities on behalf of Jeepster, all of which shall be subject to Jeepster's approval (d) Securing on Jeepster's behalf, manufacturing of all Jeepster releases hereunder. No manufacturing of Jeepster product shall be undertaken by WF on Jeepster's behalf without the prior approval of the quantities and related costs by Jeepster, however, manufacture of sufficient stock to fulfill any order received shall be deemed pre-approved. Ownership of all stock manufactured shall remain with Jeepster from the point of manufacture through storage in the chosen distributor's warehouse(s) and WF and its distributors shall use their best endeavors to realize and pay to Jeepster all monies owing to Jeepster in relation to the sale of such stock, following shipment from the aforementioned warehouse facility, subject to WF's security interest as referred to herein (e) Subject to pre-approval of a budget therefore and arrangement for payment thereof by Jeepster, provide general promotion and marketing of Jeepster's new releases as required by Jeepster.

6. **Jeepster Obligations**-During the Term hereof, Jeepster shall: (a) Provide Masters, Artwork and related materials (which shall continue to be owned by Jeepster) to WF necessary to release Albums or other product to be administered and distributed by WF (b) Jeepster shall be responsible for and directly pay to the applicable party any and all third party payments in connection with the creation, production or recording of the foregoing, including, but not limited to, all advances and royalties to artists, producers or other persons engaged in the production of the Masters and to copyright owners (including, but not limited to mechanical royalties) (c) In the event that Net Monies, as hereinafter defined, otherwise payable to Jeepster hereunder are insufficient to cover such costs and expenses, Jeepster shall be responsible for and directly pay any and all third party costs or expenses relating to the production, manufacturing, distribution and sale of its product in accordance with Paragraph 12 hereof (d) In the event that Net Monies, as hereinafter defined, shall be insufficient to cover such costs and expenses, Jeepster shall be responsible for and directly pay to WF or any other party any monies budgeted and actually incurred with respect to any and all third party costs and expenses relating to the marketing, promotion, publicity and advertising of its product, in accordance with Paragraph 12 hereof. Notwithstanding the foregoing, WF hereby acknowledges that it shall provide the staff and services of its affiliate, Hellfire Marketing without additional charge to Jeepster during the Term hereof. However, any actual out of pocket costs and expenses incurred by Hellfire shall be paid or reimbursed by

Jeepster immediately upon submission to Jeepster. In connection with Jeepster's obligations hereunder, Jeepster shall have the right to approve all costs and expenses hereunder. In the event that WF shall incur any costs or expenses on behalf of Jeepster, all such costs and expenses shall, to the extent not recoverable by WF from Net Monies, as hereinafter defined, otherwise payable to Jeepster hereunder, be reimbursed by Jeepster immediately upon submission of documentation relating thereto by WF in accordance with Paragraph 12 hereof. In the event that Jeepster shall not fulfill its obligations in this regard, WF shall automatically be granted a security interest in the physical product in existence which relates thereto. By way of clarification in connection with the foregoing, Jeepster shall not be liable for any costs or expenses which are budgeted but not actually incurred on its behalf.

7. **Payments To WF**-WF shall be entitled to the following payments:

(a). Twenty (20%) percent of "Net Monies" actually received by or credited to WF on behalf of Jeepster with respect to exploitation of Jeepster releases, from WF's subdistributors, retail accounts, retail record stores or other third parties, including, but not limited to licensees, as reflected by statements or invoices relating thereto with respect to each month of WF's services during the Term hereof. Accordingly, "Net Monies" are defined as gross monies received by or credited to WF in respect of the sale and/or other exploitation of Jeepster releases less returns and reserves held by third parties and "finder's fees" payable to such third parties in connection with synchronization and other third party licensing. By way of clarification, Net Monies as defined herein, are net of any retail discounts, or physical distribution fees charged by distributors in connection with records exploited, as well as returns, reserves and so-called "finders fees". In connection with the foregoing, for the sake of clarity, Jeepster acknowledges and agrees that for the Term, in the Territory, WF shall be exclusively entitled to collect any and all gross monies or other considerations attributable to the exploitation of Jeepster releases hereunder which relate to the physical and digital sales of records hereunder.

(b). With respect to other non-sale exploitations during the Term hereof (e.g. master licensing) of Jeepster product, WF shall receive Twenty (20%) percent of all Net Monies or other considerations paid or credited to WF in connection therewith. In connection with the foregoing, for the sake of clarity, Jeepster acknowledges and agrees that for the Term, in the Territory, WF shall be exclusively entitled to collect any and all gross monies or other consideration attributable to the exploitation of Jeepster releases hereunder which relate to synchronization and other third party agreements save that WF shall have no rights to any income earned from pre-existing synchronization or third party licensing agreements relating to releases under this agreement. Notwithstanding anything to the contrary contained herein, WF shall only be entitled to receive the foregoing percentage of Net Monies in connection with the aforementioned non-sale exploitations with respect to synchronization and other third party licenses of

Jeepster product which result from the solicitation thereof by WF. Additionally, no payment will be due WF for such licenses where WF has no substantial participation or for worldwide licenses which include the Territory which are initiated outside the Territory and agreed directly by Jeepster.

8. Accounting-WF shall account and pay Jeepster its share of Net Monies hereunder, subject to WF's right to recover monies otherwise payable by Jeepster pursuant to Paragraph 6 and 12 hereof, within Sixty (60) days of WF's receipt of monies or credits from third parties hereunder. In connection therewith, Jeepster shall have the right to audit WF in connection with the subject matter hereof, including, but not limited to sales and other exploitations hereunder. Additionally, in the event that WF audits its distributors or commences litigation in connection with collection of monies contemplated hereby, Jeepster shall be entitled to its pro-rata share of such recovery or credit in accordance with the intent hereof.

9. Credit-Jeepster and WF agree that WF have the right to be credited with and accorded logo and/or other so-called "legal line" credit in connection with all packaging and promotional materials utilized in connection with WF's services hereunder. The parties hereto shall discuss and hereafter finalize a more specific agreement with respect thereto.

10. Breach/Cure-Neither party hereto shall be deemed in breach of its obligations hereunder until Thirty (30) days following notice by the non-breaching of the nature of such breach and the breaching party's failure to cure such breach within the aforementioned time period. Notwithstanding the foregoing, such period shall be Fifteen (15) days with respect to payments, statements or the assertion of audit rights hereunder. In connection with the foregoing, any dispute relating to the subject matter hereof shall be subject to resolution in the Federal or State courts of the City and State of New York as the exclusive jurisdiction therefore and shall be interpreted in accordance with the laws of the State of New York.

11. Partnership/Joint Venture-Nothing contained in the Agreement constitutes a partnership or a joint venture between Jeepster and WF. WF will not act or represent itself to be an employee, agent or representative of Jeepster. WF hereby acknowledges that it shall have no rights in or to the master recordings of Jeepster titles released hereunder. WF hereby acknowledges that it has no rights in respect of any Jeepster titles other then as expressly written herein and soley in regard to Schedule A attached, all other releases, if any, shall be mutually agreed by the parties.

12. WF Expense Reimbursement-Notwithstanding anything to the contrary contained herein, in addition to any other rights and/or remedies afforded WF hereunder, as of the end of the Term hereof, in the event that Net Monies pursuant to Paragraph 7 hereof shall be insufficient to reimburse any out of

pocket costs or expenses actually incurred by WF or Hellfire hereunder in connection with the subject matter hereof, including, but not limited to, pursuant to Paragraphs 5 and 6 hereof, any such costs and expenses not reimbursed from Net Monies hereunder shall be deemed a direct debt between Jeepster and WF. Accordingly, the aggregate total of such unreimbursed costs and expenses shall be paid by Jeepster to WF within Thirty (30) days of WF's submission of reasonably sufficient documentation of such unreimbursed costs and expenses.

13. <u>Further Documents</u>-The parties hereto intend to draft and negotiate in good faith a more formal agreement between WF and Jeepster including, but not limited to, provisions pertaining to such matters as Warranties and Representations, Indemnification and Interpretation of this Agreement. Pending drafting, negotiation and execution of such more formal document, this memorandum of agreement shall constitute a valid, binding agreement between the parties hereto with respect to the subject matter hereof.

If the foregoing correctly sets forth your understanding of our agreement, please so indicate in the space provided below.

WORLD'S FAIR LABEL GROUP, INC.

_____
AN AUTHORIZED SIGNATORY

JEEPSTER RECORDINGS LTD.

_____
AN AUTHORIZED SIGNATORY

# SCHEDULE A

## ALBUMS

| Artist | Title |
| --- | --- |
| Salako | Re-Inventing Punctuation |
| Snow Patrol | Songs For Polarbears |
| The Gentle Waves | The Green Fields Of Foreverland |
| Salako | Musicality |
| The Gentle Waves | Swansong For You |
| Snow Patrol | When It's All Over We Still Have To Clear Up |

## SINGLES

| Artist | Title |
| --- | --- |
| Snow Patrol | Little Hide |
| Snow Patrol | 100 Things I Should Have Done In Bed |
| Salako | Growing Up In The Night |
| Snow Patrol | Velocity Girl / Absolute Gravity |
| Salako | The Moonlight Radiates A Purple Glow In His World |
| Snow Patrol | Starfighter Pilot |
| Snow Patrol | Starfighter Pilot (remixes) |
| Salako | Mappleton Sands 201298 |
| Salako | Ventimiglia 120899 |
| The Gentle Waves | Falling From Grace EP |
| Snow Patrol | Ask Me How I Am |
| Snow Patrol | One Night Is Not Enough |